1  RONALD G. ROSENBERG (Bar No. 108602)
2  ROSENBERG & KOFFMAN
   2029 Century Park East, Suite 1700
3  Los Angeles, California 90067
   Telephone:  (310) 553-1400
4  Facsimile:  (310) 553-1401
   ron@randklaw.com
5

6  Attorneys for Plaintiff,
   GreenworksUS

7

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11

12

13  GREENWORKSUS, a California          )  Case No.  C 13  1375
    corporation,                       )
14                  Plaintiff,         )  COMPLAINT FOR:
                                        )  1. VIOLATION OF
15  v.                                  )     CALIFORNIA FRANCHISE
                                        )     INVESTMENT LAW;
16  SAFE STEP WALK-IN TUB CO., a        )  2. VIOLATION OF FEDERAL
    Tennessee corporation; MICHAEL      )     FRANCHISE LAW;
17  DUFFER, also known as MIKE          )  3. UNFAIR BUSINESS
    DUFFER, an individual,              )     PRACTICES;
18                                      )  4. INTENTIONAL
                                        )     MISREPRESENTATION;
19                                      )  5. NEGLIGENT
                                        )     MISREPRESENTATION
20                  Defendants          )
                                        )  DEMAND FOR JURY
21  _____

22

23       Plaintiff, GreenworksUS ("GreenworksUS"), on behalf of itself and no

24  others, states and alleges:

25                      **General Allegations**

26

27    1.   GreenworksUS is, and at all times material hereto was, a corporation formed

28  under the laws of the State of California, with its principal place of business in San

Complaint                           1

                                              **COMPLAINT**

Ramon, California.

2.   Defendant, Safe Step Walk-In Tub Co. ("Safe Step") is, and at all times material hereto was, corporation formed and existing under the laws of the State of Tennessee, with its principal place of business in Nashville, Tennessee.

3.   Defendant, Michael Duffer, is and at all times material hereto was also known as Mike Duffer ("Duffer"), is the president of Safe Step, and resides in Nashville, Tennessee.

4.   Plaintiff performed each and every act, covenant and condition required by it pursuant to each of the agreements alleged herein, except to the extent such performance was prevented, excused or waived by Defendants.

## Jurisdiction and Venue

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a), as this is a civil action wherein the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

6.   This Court has personal jurisdiction over Defendants because Defendants' made representations to Plaintiff and signed a written agreement with Plaintiff for Plaintiff to perform services in California.

7.   Venue is proper in this District in accordance with 28 U.S.C.§1391(a)(2) in that a substantial part of work done in accordance with the agreements referred to

Complaint                                    2

**COMPLAINT**

below, was done in this District.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT, SAFE STEP, FOR VIOLATION OF

## CALIFORNIA FRANCHISE INVESTMENT LAW (Corp. Code §§31000)

8.   Plaintiff, GreenworksUS, refers to and incorporates paragraphs 1 through 7, as though fully set forth herein.

9.   On or about July 5, 2010, GreenworksUS entered into a written Agreement with Safe Step. The written Agreement referred to as the Dealership/License Agreement ("Agreement") pursuant to which GreenworksUS was to purchase bathtubs from Safe Step for resale in California.  A true and correct copy of that Agreement is attached hereto and incorporated herein as Exhibit "1".

10. Concurrently with entering into the aforementioned Agreement, an Oral Agreement was also entered into which provided that GreenworksUS could sell bathtubs throughout Central and Northern California (including Sacramento, California), as well as Reno and other adjoining areas in Nevada.  The Oral Agreement was to run concurrently with the written Agreement of July 5, 2010.

11. As a condition to enter into the written Agreement, GreenworksUS was required to pay Safe Step a fee of $10,000.

12. The Agreement provides that GreenworksUS must:

     a.   purchase the bathtubs and supplies from Safe Step,

Complaint                       3

**COMPLAINT**

   b.  use Safe Step's approved sales, marketing and installation materials,

   c.  comply with Safe Step's sales, installation and service training requirements,

   d.  send its sales and installation personnel to be trained by Safe Step,

   e.  carry out the installation and service requirements associated with warranty policies of Safe Step,

   f.  carry out special installation and service requirements or programs that Safe Step deemed necessary,

   g.  incorporate the warranties from Safe Step when selling the tubs,

   h.  use Safe Step's trademarks and tradenames as identified in the Agreement.

13. On or about April 6, 2011, Safe Step required that Plaintiff enter into an Addendum to the written Agreement.  The Addendum required Plaintiff to participate in a new marketing program established by Safe Step with a third party, and required Plaintiff to pay Safe Step for the marketing program.  That Addendum to the Agreement is attached to Exhibit "1".

14. Safe Step failed to register as a franchise with the State of California.

15. At no time did Safe Step provide Plaintiff with an offering circular explaining the proposed agreement and its terms or otherwise disclosing the information required by the law.

Complaint                              4

**COMPLAINT**

16. Defendant sold Plaintiff a disguised franchise in an attempt to avoid compliance with franchise laws that would protect Plaintiff from Defendant's wrongful acts.

17. Plaintiff is entitled to its damages incurred in connection with the Agreement in a sum in excess of $75,000, according to proof.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANT, SAFE STEP,

## FOR VIOLATION OF FEDERAL FRANCHISE

## INVESTMENT LAW (16 C.F.R. §§436 ET AL.)

18. Plaintiff, GreenworksUS, refers to and incorporates paragraphs 1 through 7 and 9 through 13, as though fully set forth herein.

19. The written Agreement (Exhibit "1") was provided in violation of the Code of Federal Regulations ("CFR.") §436 et al. due to the fact the relationship between Safe Step and GreenworksUS constitutes a franchise as defined by subsection 436.1 (h).

20. Safe Step violated 16 CFR §436.1(h) by, among other things, offering to enter into the Agreement, entering into that Agreement and taking money from GreenworksUS in connection with that Agreement, without first providing GreenworksUS with a disclosure statement as required by 16 CFR §436.2 – §426.6.

Complaint                                            5

COMPLAINT

21. Defendant sold Plaintiff a disguised franchise in an attempt to avoid compliance with franchise laws that would protect Plaintiff from Defendant's wrongful acts.

22. Plaintiff is entitled to its damages incurred in connection with the Agreement in a sum in excess of $75,000, according to proof.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANT, SAFE STEP,

## FOR UNFAIR BUSINESS PRACTICES

## (CALIFORNIA BUSINESS AND PROFESSIONS CODE

## SECTION 17200 ET SEQ.)

23. Plaintiff refers to and incorporates paragraphs 1 through 17, 19 and 20, as though fully set forth herein.

24. The aforementioned actions of Defendants in failing to provide an offering circular explaining the proposed agreement and its terms prior to execution of the Agreement, and in failing to register as a franchise and failing to comply with the franchise disclosure laws, constitutes unlawful, unfair and fraudulent practices within the meaning of California Business and Professions Code section 17200.

25. Plaintiff is informed and believes, and based thereon alleges that Defendants intentionally failed to advise Plaintiff that Safe Step needed to be registered as a franchise in order to entice Plaintiff to enter into the Agreement without providing

Complaint

6

COMPLAINT

Plaintiff with all of the information required of franchises under Federal and California law.

26. Plaintiff is informed and believes, and based thereon alleges that the wrongful conduct of Defendants as described herein is a violation of Business & Professions Code Section 17200 et seq. and is part of an ongoing pattern of conduct which will continue unless restrained.

27. Plaintiff is entitled to recover its attorney's fees pursuant to California Business and Professions Code.

## FOURTH CLAIM FOR RELIEF FOR

## INTENTIONAL MISREPRESENTATION

## AGAINST MICHAEL DUFFER

28. GreenworksUS refers to and incorporates the allegations contained in paragraphs 1 through 17, 19 and 20, as though fully set forth herein.

29. In late June early July 2010, Duffer, acting on behalf of Safe Step, told Raj Suri ("Suri") of GreenworksUS, that GreenworksUS would allowed to sell Safe Step bathtubs throughout Central and Northern California, as well as Reno and other adjoining areas in Nevada.  Duffer further represented to Suri that GreenworksUS would be able to sell the Nevada territory to another dealer.

30. Duffer made the aforementioned representations with the intention of luring GreenworksUS into entering into the written Dealership/License Agreement dated

Complaint                                    7

COMPLAINT

July 5, 2010 (Exhibit "1").

31. In reasonable reliance on the representations of Duffer, GreenworksUS entered into the aforementioned Written and Oral Agreements with Safe Step.

32. GreenworksUS is informed and believes, and based thereon alleges that Duffer and Safe Step did not intend to honor the aforementioned representations once they found other dealers to enter into agreements to sell Safe Step bathtubs in territories in Central and Northern California and in and near Reno, Nevada.

33. Duffer and Safe Step knew that at the time they made the aforementioned representations that they were false or were being made without sufficient information to accurately make the aforementioned representations.

34. As a direct and proximate result of the misrepresentations and GreenworksUS's reasonable reliance thereon, GreenworksUS has suffered damages in a sum according to proof in excess of $100,000.

35. The aforementioned misrepresentations were made by Duffer and Safe Step with oppression, fraud and malice, and with the intent to vex, injure and annoy GreenworksUS and to cause it injury. As a result GreenworksUS is entitled to punitive and exemplary damages against Duffer and Safe Step in a sum according to proof at trial.

Complaint

8

**COMPLAINT**

# FIFTH CLAIM FOR RELIEF FOR

# NEGLIGENT MISREPRESENTATION

# AGAINST MICHAEL DUFFER

36. GreenworksUS refers to and incorporates the allegations contained in paragraphs 1 through 17, 19, 20 and 29 through 32 as though fully set forth herein.

37. At the time he made the aforementioned representations, Duffer knew that he lacked reasonable grounds for believing them to be true.

38. As a direct and proximate result of the misrepresentations and GreenworksUS's reasonable reliance thereon, GreenworksUS has suffered damages in a sum according to proof in excess of $100,000.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

On the First Claim for Relief:

1.  For damages in the sum of according to proof;

On the Second Claim for Relief:

2.  For damages in the sum of according to proof;

On the Third Claim for Relief:

3.  For injunctive relief preventing Defendant from continuing to enter into Distribution Agreements without complying with the California and Federal Franchise Laws;

Complaint                                    9

COMPLAINT

On the Fourth Claim for Relief:

4.   For damages in the sum of according to proof;

5.   For punitive damages in a sum according to proof;

On the Fifth Claim for Relief:

6.   For damages in the sum of according to proof;

On All Claims for Relief:

1.   For attorney's fees according to proof;

2.   For such other and further relief as the Court deems just and proper.


Dated:  March 25, 2013                    ROSENBERG & KOFFMAN



By:  _____
           Ronald G. Rosenberg
           Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

Dated:  March 25, 2013                    ROSENBERG & KOFFMAN



By:  _____
           Ronald G. Rosenberg
           Attorneys for Plaintiff

Complaint                            10

**COMPLAINT**

### DEALERSHIP/LICENSE AGREEMENT

**Date: July 5th, 2010**

This Dealership/License Agreement is made and entered into by and between:
Safe Step Walk In Tub Co. a Tennessee Corporation ("Licensor") with its principle place of business at:
1830 Airlane Dr. Suite 4 Nashville Tennessee 37210
and Greenworks US with its principal place of business at,
2500 Old Crow Canyon Road, Suite 4, San Ramon, CA 94583

### RECITALS

1. Licensor is the owner and holder of certain Safe Step trademarks and trade names for the sale and marketing of walk in bathtubs and associated products to retail and commercial customers ("Safe Step Walk In Tub Co." with slogan "Safety Never Felt So Good").

2. Licensor has entered into a production and manufacturing agreement with an OEM exclusive, for the production and delivery of walk in bathtubs, accessories and associated products.

3. Licensee desires to promote market, sell and install Safe Step Walk In Tubs, accessories and associated products in the geographic area defined by this Agreement, and in strict accordance with the terms and conditions of this Agreement.

1 GRANTING OF APPOINTMENT: Licensee will be appointed as the exclusive **Licensee** to market, sell, install and service only the products (the **"Products"**), reflected on the attached form. Licensee shall purchase the Products from the Licensor in accordance with the terms and any conditions of this Agreement. Licensor may amend, modify, add or discontinue any **"Products"** with prior written notice. Licensee agrees that it will only market the Product(s) in its area or areas of prime responsibility ("Territory"), (defined in paragraph 4) from locations approved by Licensor in its discretion not to be unreasonably withheld. **Licensee** agrees to use its best efforts to market, sell, promote and install the Products and related services covered by this Agreement. Licensee shall pay to Licensor a License Fee in the Amount of $10,000.00 commencing upon the execution and delivery of this Agreement by the parties hereto, and no annual Licensee Fee thereafter. (See Dealership Seller Agreement Attached)

2. TERM. This Agreement will commence o 7/05/10 and will continue for a period of five (5) years (the "Term") unless terminated as provided herein. Provided Licensee has complied with the terms and conditions of this Agreement, Licensee shall have the option of renewing this Agreement for subsequent five (5) year terms (each an "Extension Term") upon providing written notice to the Licensor no less than 90 days prior to the end of the term or an Extension Term.

3. TERMINATION:

1



a. <u>BY LICENSOR:</u> The Licensor may terminate  this Agreement and the relationship created hereunder at any time for "Licensor's Cause".. The term "Licensor's Cause" as used in this Section shall mean the following conduct by L icensee.

(i) Failure to complete training or com mence business operation within 60 days after the execution date of this Agreement.

(ii) Willfully damaging the Licensor's pr operty, business reputation, or goodwill, and such default, if curable, has not been c ured within 30 days after receipt of notice from Licensor;

(iii) Making false statements that  materially affect the terms of this agreement, or committing a felony involving theft, fraud or embezzlement that would result in material harm to the business conducted by Licensee.

(iv) Violation of any terms or covenant of confidentiality or non-disclosure contained in this Agreement that is not cured, within 30 days of receipt of notice. This is to include information considered proprietary to the Licensor such as agreements, documents, forms, marketing, and advertising information, and financial data including sales and business plans, which have been subject to reasonable efforts by the Licensor to maintain their confidentiality.

(v) Failure to perform or breach of any covenant, term or condition of this Agreement, which breach is not cured within 30 days after receipt of notice from Licensor.

(vi) Default by Licensee under any mortgage, deed, trust or lease with any third party covering the premises in which the Licensee conducts business,  that is not cured within 30 days after receipt of notice from Licensor.

(vii) Failure to pay any financial obligation pertaining to the operation of the business as outlined in this agreement, and such default is not cured within 30 days after receipt of notice from Licensor.

(viii) Failure to provide within 30 days of receipt of notice monthly sales reports, income statements and balance sheets; provided, however, the Licensor shall not request such data more frequently than once a month.

(b) <u>BY LICENSEE</u> The Licensee may terminate this Agreement and the relationship created hereunder at any time for "Licensee's Cause" as used in this Section shall mean the following conduct by the Licensor, its affiliates or other licensees:

(i) Failure to perform or breach of the covenants or terms and conditions of this agreement by the Licensor that have not been cured within 30 days after receipt of notice of default from Licensee.

2

(ii) Infringement by the Licensor, its affiliates and licensees on the Licensee's Territory granted pursuant to paragraph 4 by the sale or advertisement of ant items competitive to the Products within the Territory.

(iii)Excluding items from the definition of Products if those items will still be sold by the Licensor.

Termination pursuant to this Section or otherwise shall not relieve either party of its responsibilities, duties, and obligations contained in this Agreement, which shall continue thereafter pursuant to the terms of this Agreement; provided, however, if the Licensee terminates this Agreement for Licensee's Cause the restrictive covenant contained in paragraphs 13 and shall not apply to Licensee. Upon termination of this Agreement for any reason, whether by default of Licensee or otherwise , Licensee shall provide to Licensor, all sales, service, installation and customer records, generated by Licensee during the term of this Agreement. Licensee shall execute an assignment of telephone numbers used in conjunction with the Licensee's business operations or utilized in any Product advertisement to Licensor, in the form attached hereto. Licensee shall also immediately return any and all sales training support and promotional materials purchased from, or provided by, Licensor, or which depicts any Licensor trade name or trademark. Upon the termination of this Agreement for any reason, the Licensor shall at the request of the Licensee repurchase any unsold Products purchased by the Licensee at the price the Licensee paid for such Products, condition of said products will determine a lower value if products can't be resold or reused as, in new condition. Termination by either party must be in writing and mailed to all parties named in paragraph 21.

4.  **EXCLUSIVITY**
    (a)  **TERRITORY.** For purposes of this Agreement, the term Territory shall be defined as the geographic boundaries of the county or counties , state or country, which have been mutually agreed to and are attached hereto as **Licensee Territory Addendum.**
    (b)  **LICENSEE RELATIONSHIPS.** Licensee shall not enter into any partnerships or joint ventures with any bathtub manufacturer, retailers, etc. absent the Licensor's prior written permission which shall not be unreasonably withheld. The Licensor anticipates that it will generate business opportunities in an ongoing fashion to compliment lead generation on a world, national and local territorial basis. Licensee will be offered the right to participate in these opportunities under the terms and conditions provided by the Licensor. These terms may include predetermined retail pricing, prearranged revenue sharing with business partner and designated reporting requirements. Licensee agrees neither that he/she nor any other person or entity operating through or under Licensee, enter into any partnerships, affinity relationships, joint ventures, marketing affiliation agreements, revenue sharing agreements, profit sharing agreements, commission agreements or similar arrangement(s) with any bathtub manufacturer, retailers, etc. absent Licensor's prior written permission or work on any of those opportunities, except with the consent and under the terms established by the Licensor. The Licensor reserves the right to manage those opportunities (including but not

3

limited to retailers) independently in that territory and handled directly by the Licensor or a designated representative should Licensee elect not to participate.

5.  **MINIMUM SALE REQUIREMENTS.** Licensee will be required to achieve certain minimum sale requirements of Products (not including parts and supplies) from Licensor in its Territory **or** maintain the minimum advertising budget validated through a monthly media placement report as indicated on the attached **Minimum Sale Requirement Addendum.** Failure by the Licensee to achieve the Minimum Sale Requirement or advertising budget campaign outlined in the attached addendum for a period of six (6) consecutive months shall permit the Licensor and its other licensees to make sales within the Territory and void the conditions of paragraph 4 (b), 8 (i), but shall not entitle the Licensor to terminate this Agreement without cause.

6.  **NO COMPETITIVE PRODUCTS.** Licensee agrees to: a) market, sell and install exclusively only Licensor approved Products (all such items being referred to herein collectively as the "Safe Step Walk In Tub Products"); and b) shall not market, sell, lease, promote, or install directly or indirectly, any products that are competitive with Safe Step Walk In Tubs. Licensee shall purchase walk in bathtubs only from the Licensor. Licensee may utilize enhancements to Safe Step Walk In Tubs Products that offer increased revenue to the Licensee. Licensee agrees that any other Product categories that the Licensee may wish to sell in its territory not currently offered by the Licensor will require written authorization, which shall not be unreasonably withheld.

7.  **LIMITATION TO LICENSOR TRADEMARKS, PRODUCTS AND BRAND.** During the term of this Agreement, Licensee shall not sell or install advertise or otherwise market the Products outside the Territory, nor shall any other person or entity operating through or under Licensee. If Licensee advertises the Products along with other merchandise in media of broader circulation, or by mailings that may reasonably be expected to reach potential customers outside the Territory, that advertising and those mailings must prominently state the counties (or other designation if appropriate) comprising the Territory, and that the Products are sold, only in that area.

8.  **OBLIGATIONS OF LICENSOR.** During the Term of this Agreement, Licensor agrees to:
    a.  Provide Licensee with access to catalogues, sales materials, specification sheets, and sales promotion literature and any other related items as necessary, at its cost to be used in connection with marketing, solicitations and installation hereunder. The Licensor will provide initial training and ongoing support to promote the success of the Licensee.
    b.  Send all relevant sales leads in the Licensee's Territory which are secured by the Licensor through customer inquiry, advertising, website, trade shows or any other type of media lead generation to the Licensee.
    c.  Offer for sale to Licensee the Products and related services in accordance with the terms states herein and conform to industry standards. Any amended or modifications of the Products offered to the Licensee will be of equal or greater quality.

4

d.  Provide prompt service for the ordering of Products and accessories on a professional best efforts basis. Delivery is subject to the manufacturers' ability to produce and transport the Products on a timely basis.

e.  Not violate any known property rights or trademarks or copyrights in the delivery of any Products, services and relationships under this Agreement.

f.  Maintain the pricing suggested by Licensor, not to have more or less than a 15% swing in retail pricing. Licensor does realize that there can be fundamental differences in geographic condition costs and labor that may cause pricing to have a larger or smaller swing than the aforementioned 15%. This must be approved by Licensor and will not be unreasonably withheld.

g.  Hold the Licensee harmless for any liabilities of the Licensor in regard to any state or federal governmental requirements relative to sales, distribution, advertising or reporting of appropriate state, federal or local taxes.

h.  Warrant that the prices and terms offered to all Licensees are consistent relative to all markets (shipping, freight, geographic condition costs and labor variances may vary based upon market.)

i.  Prohibit its affiliates and other Licensee's from selling or advertising or otherwise marketing the Products inside the Territory. If the Licensor, its affiliates and Licensee's advertise the Products together with other merchandise in media of broader circulation, or by mailings that may reasonably be expected to reach potential customers inside the Territory, such advertising and those mailings must prominently state that the Products are sold, only outside the Territory. Any Affiliate must refer all inquiries to the appropriate Licensee of the territory to which that Licensee holds an appointment.

9.  **OBLIGATIONS OF LICENSEE.** Licensee agrees to use its best efforts and professionalism in performing the following activities for the Licensor during the term of this Agreement:

a.  Comply with the sales, Product ordering and delivery procedures, and approved Products installation procedures established by the Licensor.

b.  Provide active and continuous sales representation and marketing of the Products in the Territory.

c.  Vigorously promote the sale and installation of the Products in Territory;

d.  Maintain procedures and records to assure systematic and complete sales, and marketing coverage of the Territory;

e.  Keep the Licensor advised as to the general market conditions affecting the sales and installation of the Products.

f.  Follow-up and attempt to resolve customer complaints from the sale and installation of the Products with notification to the Licensor of all said disputes and status of resolution monthly.

g.  Submit reports for leads, sale and revenue activity to the Licensor setting forth such information as the Licensor may reasonably request, including but not limited to, customer contacts made during each month sales percentages and sales projections. And install reports on completed, in-progress, and production projections.

5

h. Conduct its business in a professional and ethical manner and not impinge or jeopardize the business practices or business image of the Licensor or otherwise damage to the Licensor, nor shall it knowingly allow such practices as might do such damage by others;

i. Make reasonable efforts to handle satisfactorily all matters relating to the sale and installation of the Products in the Licensee's Territory;

j. Make no false or misleading statement or representation to a customer as to the Products or the prices or charges thereof.

k. Obtain and utilize approved Licensors sales, marketing and installation materials. Any materials other than those prescribed by Licensor must be pre-approved.

l. Follow up on all sales leads and installations in a timely manner.

m. Comply with at Licensee's sole cost and expense, Licensors sales, installation and service training requirements to include continuing education.

n. Comply with all federal, state and local license ,code and permit requirements.

o. Utilize only properly trained, licensed, and properly insured installers for the Products, including providing written evidence of general liability insurance and worker's compensation insurance for all installers and technicians.

p. Provide written evidence of liability insurance, reasonably acceptable to Licensor, in amount not less than $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

10. <u>SALES, INSTALLATION AND SERVICE OBLIGATION.</u> The Licensee may only market, sell, install and service the Products in its Territory where it can provide prompt, professional, willing and courteous maintenance, repair and warranty service, in accordance with industry standards.

The Licensee shall: a) establish and maintain a qualified sales and properly insured installation staff trained for the products: b) send its sales and installation personnel to such training as Licensor shall offer from time to time: c) maintain an adequate inventory of Licensor brand spare parts and supplies to perform its service obligations: d) not sell parts and supplies which do not meet Licensors specifications: e) comply with and carry out the installation and service requirements associated with warranty policies and procedures: f) carry out any special installation and services requirements or programs which Licensor deems necessary: g) maintain accurate records of the installation and service performed on the Products.

From time to time, upon reasonable advance notice, Licensors Representatives may visit Licensee's location and evaluate the installation, sales and service provided by Licensee. Licensors representatives may inspect Licensee's sales, service and installation records and facilities to assure compliance with the above standards and to obtain service data related to the Products. Licensee agrees to take any reasonable and cost effective correction action requested by Licensor to help possibly to improve Licensee's sales, service and installation procedures as well as over-all business.

11. <u>WARRANTIES AND WARRANTY SERVICE.</u> Licensee agrees to incorporate the Licensor's limited warranties packaged with the Products in each of its agreements for sale to the end-user. As an

6

integral part of Licensee's  service obligation, **Licensee** · vill perform, pursuant to the Licensor's Products Warranty Policies and Procedures (the "Warranty Policies") in effect at the time, without charge to the end-user, such service as may be  required to fulfill the provisions of Warranty Policies. Licensee agrees to service labor for  a minimum of two (2) years at no cost to customer, **Licensor** or Manufacture. **Licensee** may offer an extended term to customers at **Licensee's** discretion.

The **Products** are warranted to Licensee and end-users only to the extent, and in accordance with the conditions, set forth in the Warranty Policies. There are no other warranties on the Products. ANY CURRENT WARRANTY PUBLISHED BY MANUFACTURER IS IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANGABILITY OR FITNESS FOR A PARTICULAR PURPOSE. LICENSOR  SHALL IN NO EVENT BE LIABLE FOR AND SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THE SALE OF ANY ITEM TO LICENSEE OR OTHERWISE.

Licensor's liability, if any, shall in all events be limited to repair or replacement of any defective **Products**, all to the extent set forth in the Warranty Policies, and **Licensee's** rights to obtain repair or replacement pursuant to any such warranty statement shall be the **Licensee's** sole and exclusive remedy. Notwithstanding the foregoing, the **Licensee** shall not be responsible for any inherent defects in the **Products** and to the extent that the **Licensee** is not indemnified by the Warranty Policies, the **Licensor** shall indemnify the **Licensee** as provided by paragraph 20. Without limiting any of the foregoing, Licensor shall incur no liability to Licensee or any customer or arising out of any contract or arrangement between Licensee and any of its customers, unless Licensor shall expressly and in writing agree to the contrary. If Licensee's warranty to the customer is greater than the Manufacturer's Limited Warranty, **Licensee** shall advise customer that **Licensor** and Manufacturer are not responsible for **Licensee's**  extended warranty to the extent such warranty provides warranties in excess of the Licensor  warranty obligations in this Agreement.

12. <u>CONFIDENTIALITY</u>. Licensee acknowledges  that it will have access to and may become aware of certain proprietary and confidential information, including, but not limited to, trade secrets and other information valuable to the **Licensor**  and its customers, which must be maintained in strict confidence. **Licensee**  agrees not to use or disclose to any firm, individual, or institution, at any time for any reason any confidential information, including, but not limited to, trade secrets, customer lists, distributor lists, distributor customer lists, sources of supply, special manufacturing processes, contemplated new **Products** or services, data, sales figures, sales strategy, prices, and personnel history, of the Licensor  (the Confidential Information), to the extent the Confidential Information was obtained by **Licensee**  from Company or any other source  during the term of this Agreement. The provisions of this paragraph shall remain in effect during the term of this Agreement, as well as at all times thereafter, even after  Licensee is no longer representing the **Licensor**  in any manner, regardless of the reason or conditions for any such termination of the relationship or representation.

7

13. **NON-INTERFERENCE.** Licensee agrees that during the Term of this Agreement and for a twenty four (24) month period following the termination of Licensee's representation of the Licensor for any reason by either party, Licensee shall not (i) purposefully interfere with any of the Licensor or new Appointed Licensee's contracts existing during the Term hereof or existing and in effect as of the date of termination of this Agreement; (ii) directly or indirectly solicit for Licensee's own account or for another, any of the employees or sales representatives of the Licensor or new Licensee employed by or working on behalf of the Licensor or its affiliates at the time of Licensee's termination; (iii) directly or indirectly interfere with the Licensor's current customers as of the date of termination of this Agreement by using the Licensor's internal data in a damaging or derogatory manner that would potentially hinder the Licensor's relationship with its customers; (iv) contact or solicit for Licensee's own account the Manufacturer or any Manufacture for the purchase, production of any bathtub products in the Territory; or (v) directly or indirectly solicit for Licensee's behalf or any other customer of the Licensor or its affiliates (1) which has been solicited by Licensee during the Term of this Agreement, or (2) whose account was serviced in whole or in part by Licensee, or (3) who Licensee was aware of Licensor's intent to solicit and which Licensee possessed or had access to substantial information or materials obtained by the Licensor pertaining to such customer or its products or requirements.

14. **RELATIONSHIP OF THE PARTIES.** It is expressly understood the Licensee is an independent contractor and has not been granted a franchise. The Licensee shall immediately notify Licensor of any substantial change in the operating management of Licensee or any sale, transfer or relinquishment of any substantial interest in the direct or indirect ownership of Licensee or its business. Any change in the operating management, sale, transfer or relinquishment of any interest in the direct or indirect ownership of Licensee or its business MUST be approved by Licensor 30 days prior, which will not be unreasonably withheld. Licensee will not under any circumstances sign on licensor's behalf any agreements, forms or other documents. This Agreement will not create a partnership, employment, or agency relationship between licensor and Licensee, and no act or obligation of either party shall in any way bind the other except as expressly set forth herein. Salespeople and other employees utilized by Licensee in connection with its obligations hereunder will be under the management and control of Licensee and, under no circumstances, will be considered employees or agents of Licensor.

15. **TRADEMARKS.** Licensee acknowledges the validity of the Safe Step trademarks, slogans and other trade names or trademarks affixed to the Products, and that such trademarks and trade names are exclusively owned or controlled by Licensor. Licensee further acknowledges that considerable time and money have been expended to create the goodwill associated with the Safe Step trademarks, slogans and that such goodwill belongs to Licensor. Nothing contained herein shall give Licensee any interest or right in the trademarks or other trade names affixed to the Products except as is expressly granted herein. Licensee shall not use the trademarks and logos Safe Step, and Safe Step Walk In Tub Co. as well as slogan "Safety Never Felt So Good", trademarks or any other trademark owned or controlled by Licensor or its parent except as specifically authorized by Licensor. Licensee shall not use Licensor's trademarks as part of its

8

corporate, trade or other business name; or in any manner not approved or authorized by Licensor; or in any manner in which Licensor concludes, in its sole judgment, is confusing or misleading, or reflects negatively on the quality or goodwill associated with the trademarks of Licensor; provided, however, the Licensee shall be entitled to use the designated Safe Step market brand affiliation or a variation or abbreviation thereof as its corporate name. Licensee shall not alter or remove the Licensor trademarks from any of the Products, or affix any other name or marks to the Products.

16. **ETHICS.** Licensee and Licensor will maintain the highest ethical business standards and avoid and refrain from being involved in any activities which may in any manner disparage the Licensor's name, any of Licensor's marks, or the Licensor Products or the Licensee. Further, in the conduct of business, Licensee and Licensor will comply with all federal, provincial, state and local laws, rules and regulations.

Licensee shall make no statement which contains representations with respect to the Products which exceeds the specifications approved in writing by Licensor. Licensee shall not make any false, misleading or deceptive representations to anyone or engage in any unfair trade practices. Each party shall be solely responsible for the actions of its personnel and its sales and service representatives. Licensee shall indemnify and hold Licensor harmless from any and all liability or damages that may result from a breach of this section by Licensee. Licensor shall indemnify and hold Licensee harmless from any and all liabilities or damages that may result from a breach of this section by Licensor.

17. **DELAYS.** Neither party will be liable under this Agreement for damages or delays caused by strikes, vendors, lock-outs, accidents, delays in manufacturing, delays in carriers, acts of God, governmental actions, or any other causes beyond its control.

18. **ARBITRATION.** Any controversy, dispute or claim arising out of, in connection with or otherwise relating to any provision of this Agreement, or to the breach, termination or validity hereof or any Transaction, contemplated hereby (any such controversy, dispute or claim being referred to as "Dispute"), shall be finally settled by arbitration conducted expeditiously in accordance with the Commercial Arbitration Rules then in force ,the "AAA", with application of the following additional procedural requirements. A single arbitrator ( the "Arbitrator") shall be appointed by the AAA . The Arbitrator's conduct shall be governed by the current version of the Code of Ethics for Arbitrators in Commercial Disputes that has been approved and recommended by the AAA and the American Bar Association.

The situs for arbitration pursuant to this Section shall be as agreed to by the parties, failing which it shall be Davidson County, Tennessee. Each party may submit memoranda and other documentation as it or he deems appropriate to aid the formulation of the Arbitrator's decision, and request a hearing (which may be conducted in person or telephonically) so as to be able to present oral testimony and argument. A final arbitration decision and award shall be rendered as soon as reasonably possible and, in any event, within 30 business days following appointment of the Arbitrator; provided, however, that if the Arbitrator determines that fairness so requires,

9

such period may be extended by no more than 30 additional days. The Arbitrator shall have the right and power to shorten the length of any notice periods or other time periods provided in the AAA Rules and to implement Expedited Procedures under the AAA Rules in order to ensure that the arbitration process is completed within the time frames provided herein.

The arbitration decision or award shall be reasoned and in writing, and the Arbitrator shall have the right and authority to determine how the decision or award as to each issue and matter in dispute may be implemented or enforced. Any decision or award shall be final and conclusive on the parties, may include an award of damages, and will not be subject to appeal, review or re-examination by a court of the Arbitrator, except for perjury, fraud, manifest clerical error, or evident partiality or other misconduct by the Arbitrator that prejudices the rights of a party. Judgment upon any decision or award may be entered in any court of competent jurisdiction in the State of Tennessee or elsewhere; and the parties hereto consent to the application by any party in interest to any court of competent jurisdiction for confirmation or enforcement of such decision or award. The Arbitrator shall determine all the costs and expenses of the arbitration, including travel, transcription and photocopying expenses, any costs of obtaining a location for the arbitration hearing, and the fees, costs and expenses of experts, witnesses, the AAA, the Arbitrator, court reporters, and the attorneys of the parties to the Dispute; and shall include in his or her award or decision an allocation for the foregoing fees, costs and expenses between the parties to the Dispute on such basis as the Arbitrator determines to be fair and reasonable under the circumstances, which may take into account the outcome of the arbitration and provide for all those fees, costs and expenses to be allocated to the losing party. Any arbitration held pursuant to Agreement, be governed by the substantive law of the State of Tennessee. All arbitrations commenced pursuant to this Agreement while any other arbitration hereunder shall be in progress shall be consolidated and heard by the Arbitrator.

19. <u>PACKAGING AND LABELS.</u> Licensee shall not change, mutilate, or obscure any trademark or trade name of the Licensor appearing on the Products or re- label the Products. Licensee shall not claim at all any time and right, title or interest in the trademark or trade name of the Licensor or the right to use any of them except in connection with the resale of the Products purchased during the term of this Agreement.

20. <u>INDEMNITY.</u>

    a.   <u>BY LICENSEE.</u> Licensee hereby agrees to indemnify and hold Licensor, its officers, directors, employees, agents, successors or assigns, harmless from any liabilities, claims, costs and expenses incident to any claim, loss, damage, expense or injury (including death) to the person or property of Licensor, or to the person or property of any employees, subagents, servants or any persons subject to the supervision of Licensor, due to a breach if any of Licensee's covenants or any acts, omission or negligence or Licensee, or any employees, subagents, servants or any persons subject to the supervision of Licensee; provided, however, this indemnity shall not apply to the extent such claims is the result of the fault or negligence of the Licensor and to product liability claims which are the responsibility of the Licensor except to the extent such claims are

10

the result of the fault of negligence of the Licensee. The indemnification obligations of the Licensee pursuant to this Agreement shall expire upon the five (5) year anniversary of the termination of this Agreement

b. **BY LICENSOR.** Licensor hereby agrees to indemnify and hold Licensee, its officers, directors, employees, agents, successors or assigns, harmless from any liabilities, claims, costs and expenses incident to any claim, loss, damage, expense or injury (including death) to the person or property of Licensor, or to the person or property of any employees, subagents, servants or any persons subject to the supervision of Licensee, due to a breach of any of Licensor's covenants or any acts, omissions or negligence or Licensor, or any employees, subagents, servants of any persons subject to the supervision of Licensor; provided, however, this indemnity shall not apply to the extent such claim is the result of the fault or negligence of the Licensee. The indemnification obligations of the Licensor pursuant to this Agreement shall expire on the five (5) year anniversary of the termination of this Agreement.

21. **NOTICE.** Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by recognized overnight delivery, certified or registered mail, return receipt requested, to the parties at the following addresses:

**To Licensor at:**

Safe Step Walk In Tub Co., 1830 Airlane Drive Suite 4 ,Nashville ,Tennessee 37210

**To Licensee at:**

Greenworks US, 2500 Old Crow Canyon Road, Suite 410, San Ramon, CA 94583

22. **ASSIGNMENT.** This Agreement may not be assigned by Licensee, Unless proper approval from Licensor as specified in this agreement.

23. **RULES OF CONSTRUCTION.** This Agreement shall be construed as follows:

All exhibits and schedules referenced herein and attached hereto constitute the entire agreement between the parties hereto pertaining to the subject matters hereof, and supersedes all negotiations, preliminary agreements, and all prior and contemporaneous discussions and understandings of the parties in connection with the subject matters hereof. Except as otherwise provided herein, no covenant, representation or condition not expressed in this Agreement, or in an amendment hereto made and executed in accordance with the provisions of this paragraph shall be binding upon the parties hereto or shall affect or be effective to interpret, change or restrict the provisions, or conditions of this Agreement; (ii) No change, modification or termination of any of the terms, provisions, or conditions of this Agreement shall be effective unless made in writing and signed or initialed by all parties hereto, their successors or assigns; (iii) If any paragraph, subparagraph or other provision in this Agreement, or the application of such paragraph, subparagraph or provision, is held invalid, then the remainder of the Agreement, and the application of such paragraph, subparagraph or provision to persons or circumstances other than those with respect to which it is held invalid, shall not be affected thereby; (iv) This Agreement shall be binding upon and shall inure to the benefit of the

21

parties hereto and their respective successors, personal representatives, heirs and permitted assigns; (v) This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and in making proof hereof it shall not be necessary to produce or account for more than one such counterpart; (vi) All remedies shall be cumulative and not alternative.

24. **INJUNCTIVE RELIEF**. Notwithstanding the provisions of paragraph 18, each party shall have the right and may apply to a court of competent jurisdiction for equitable relief from any violation or threatened violation of the covenants of this Agreement in addition to any other rights or remedies available at law or in equity. Each party hereto agrees to and irrevocably submits to venue and exclusive jurisdiction for any legal action authorized hereunder to be in the appropriate state or federal court located in Nashville, Tennessee. The prevailing party in any such legal action shall be entitled to receive its attorneys' fees. In view of Licensee's access to the Confidential Information and Trade Secrets of Licensor and in consideration of the value of such property to Licensor, Licensee expressly acknowledges that the covenants not to compete and the related restrictive covenants set forth in this Agreement are reasonable and necessary in order to protect and maintain the proprietary and other legitimate business interests of Licensor and that the enforcement thereof would prevent Licensee from earning a livelihood. Each party further agrees that in the event of an actual or threatened breach by the other party of such covenants, the non-breaching party would be irreparably harmed and the full extent of injury resulting there from would be impossible to calculate, and the non-breaching party therefore will not have an adequate remedy at law. Accordingly, each party agrees that temporary and permanent injunctive relief would be appropriate remedies against such breach, without bond of security; provided, that nothing herein shall be construed as limiting any other legal or equitable remedies the non-breaching party might have.

25. **ATTORNEY FEES**. In the event of a breach of this Agreement by either party, or in the event of any dispute between Licensee and Licensor, whether or not arbitration, or litigation is instituted, the prevailing party shall be entitled to recover its attorneys fees, costs, and expenses, for and including those incurred in arbitration or litigation, and any appeal of an order or judgment entered in any arbitration or litigation proceeding from the non-prevailing party.

26. **TERRITORY**. The territory is defined as the counties listed from the following states:

27. **TERRITORY determined by DMA according to Nielson Media Research**.
   Mendocino, Lake, Sonoma, Napa, Marin, West Solano, Contracosta, Alameda, Santa Clara, San Francisco, and San Mateo.

There are no other counties in this Sub-DMA other than the ones listed above.

12

## Trademarks, Marks, Slogans and Names

All translated Names and Marks including but not limited to all Names and Marks listed on current price list together with all Names and Marks introduced or created by the supplier and attached to or use in connection with the Products, from time to time.

Any others that may be used in the future as well as these listed below:

Safe Step    Safe Step Bath    Safety Never Felt So Good    The Walk In Tub Co.

Safe Step Walk In Tub    Safe Step Walk In Tub Co.    Regal    Regal Independence

Safe Step Tub    Gentle Jet    Comfort Seat    No-Strength    No-Strength Handle

No-Strength Locking Handle    No-Strength Locking Door    Solid Surface ABS

Solid Surface    Easy Reach    No Help Required Bathing    PHTS

Personal Hygiene Therapy System

## Pricing

See Current Price Lists

13

SIGNATURE PAGE: IN WITNESS THEREOF, the Parties hereto have executed this Agreement

By: _____ Date: 7, 1, 2010,
     (signature)

RAI SURI

GREENWORKS, US

Safe Step Walk In Tub Co.

By: _____ Date: _____
     (signature)

MIKE DUFFER

SAFE STEP WALK-IN TUB CO.

Witness

By: _____
     (signature)

PATTY PETTITT, OFFICE MANAGER

14

# Territory Addendum

**SAN FRANCISCO DMA:** <u>according to Nielson Media Research designated by the following</u> <u>counties in</u>:

Alamenda, Contra Costa, Lake, Marin, Mendocino, Napa, San Francisco, San Mateo, Santa Clara, Solano West, Sonoma

There are no other counties in this Sub-DMA other than the ones listed above.

15



## Master Copies

### Addendum/License Agreement

### Green Works U.S

## Addendum to Dealership/License Agreement

THIS ADDENDUM HEREBY MODIFIES the Dealership/License Agreement entered into between Safe Step Walk in Tub Co. ("Licensor") and ⎯⎯Greenworks US⎯⎯ ("Licensee").

### Marketing Addendum

Licensor has entered into a marketing agreement (herein referred to as "the Agreement") with firstSTREET for Boomers and Beyond, Inc. (herein referred to as "firstSTREET")to generate leads for Licensee through various advertising campaigns, commencing on or about February 1, 2011. Licensee hereby agrees to pay Licensor for the cost of advertising campaigns during the term of the Agreement as follows:

**A.  FEES:**

- **Lead Fee:**  A customer that contacts firstSTREET, Licensor and Licensee in response to advertisements run by firstSTREET will be referred to as a Lead.  Licensee will pay Licensor a Lead Fee of $15.00 per unique Lead provided to the Licensee.  A unique Lead is defined as a Lead that is not a duplicate phone number, a call from a pay phone, a call from a detention center and a Lead call that is not under 15 seconds in length.  A unique Lead does include voice mail messages (regardless of whether such messages reach 15 seconds in length).  The Lead Fee is subject to change in the future, and cannot increase more than twice by 15% increments during the term to a maximum of $19.50.  Any variation from the $15 per unique Lead amount will be determined by firstSTREET with approval by Licensor.

- **Marketing Fee:**  Licensee will pay Licensor a Marketing Fee for each Closed Sale that will be 11 ½ % of the gross installation sales amount.  A Closed Sale is the sale to a Lead by Licensee of a walk-in tub which is installed and/or any other services, merchandise or products.  The term "gross installation sales amount" will include the cost of walk-in tub and/or any other products and merchandise, installation, permitting, shipping and handling, processing, remodeling and any other fee, tax or amount charged to and/or paid for by a customer, less any customer accommodation deductions or change orders.  Any change orders must be submitted in writing to Licensor for tracking purposes.  In the event there is a "chop" or reduction due to financing programs (excluding those involving credit cards) the Marketing Fee will be based on the gross installation sales amount less 50% of the "chop" (e.g. gross installation sales amount $10,000; 10% "chop" or $1,000; Marketing Fee $1,092.50 [$10,000-($1,000 x 50%) x 11.5%]).  The Marketing Fee is due regardless of whether the customer pays Licensee for the Closed Sale.

- In the event that the aggregate quarterly net close rate of Licensee is under 7%, Licensee will pay Licensor an additional percentage of the gross installation sales amount from each Closed Sale made by the Licensee during the quarter in which the Licensee did not meet the 7% close rate number as follows:

  - If the Licensee aggregate quarterly net close rate is 7% or over, Licensor will not receive an additional percentage.
  - If the Licensee aggregate quarterly net close rate is 6-6.99%, Licensor will receive an additional 1% of the gross installation sales amount from each Closed Sale by the Licensee.

1

# Addendum to Dealership/License Agreement

- o If the Licensee aggregate quarterly net close rate is 5-5.99%, Licensor will receive an additional 2% of the gross installation sales amount from each Closed Sale by the Licensee.
- o If the Licensee aggregate quarterly net close rate is 3-4.99%, Licensor will receive an additional 3% of the gross installation sales amount from each Closed Sale by the Licensee.
- o If the Licensee aggregate quarterly net close rate is under 3%, Licensor will receive an additional 4% of the gross installation sales amount from each Closed Sale by the Licensee.

The net close rate will be calculated as the number of net tubs sold divided by the number of unique Leads received during the quarter by the Licensee. At the end of each quarter, Licensee will have until the 10th of the following month to finalize and disposition all good sales for the quarter. Contracts in Finance Pending/Hold status will only count as a net tub sale in the quarter, if the customer received financing approval, the rescission period is passed, and the tub has been ordered. A quarterly reconciliation will then be prepared by Licensor either issuing credit or additional billing. Any changes to net jobs reported after the 10th will be counted towards the new quarter. The net close rate calculation will include net tub sales and Leads outside of the Licensee's Territory (if applicable), and will be cumulative of all net tub sales and Leads in multiple Territories if Licensee handles multiple Territories.

The initial billing in 2011 will be based on the 2010 (Licensee start date to January 2, 2011) cumulative net close rate.

- ▪ Any calls resulting from the firstSTREET advertisements or campaigns will be considered a new prospect and those which convert into installed sales will be subject to the 11.5% marketing charge, as adjusted. In addition, any product sold by the Licensee to a Lead generated by firstSTREET will be reported and counted as a net sale and will be subject to the appropriate marketing charge.

- ▪ Notwithstanding anything in this Addendum to the contrary, the Marketing Fee must be received by Licensor within 90 days of the date on which the Lead signed a contract for work with the Licensee. If a contract is sold and not installed within 90 days, it should be cancelled and re-instated, when the Licensee's customer is prepared for the installation.

## B. PAYMENT OF FEES:

- ▪ Lead Fee: Licensor will bill Licensee every two weeks for the firstSTREET unique Leads received. A report detailing the calls subject to the payment will be available upon request and payment is due to Licensor upon receipt. If Licensee fails to make payment within seven days from invoice date, Licensor may require Licensee to ACH all payments prospectively and charge a penalty of $50 per day, plus attorney and collection fees

- ▪ Marketing Fee: All installations and firstSTREET activity (i.e. leads set, appointments issued, etc.) is to be reported by noon local time on the Monday following the week in which the

2

## Addendum to Dealership/License Agreement

installation occurred, or the sale occurred in the event that there is no installation (e.g. sale of bath liners). Licensor will invoice Licensee for marketing fees which are due upon receipt. If Licensee fails to make payment within seven days from invoice date, Licensor may require Licensee to ACH all payments to Licensor prospectively and charge a penalty of $50 per day, plus attorney and collection fees.

- The additional percentage of the gross installation sales amount from Closed Sales that is due when Licensee does not maintain the 7% aggregate quarterly close rate will be paid on a quarterly basis by Licensee to Licensor. The payment due will be invoiced by Licensor and is due upon receipt. If Licensee fails to make payment within seven days from invoice date, Licensor may require Licensee to ACH all payments to Licensor prospectively and charge a penalty of $50 per day plus attorney and collection fees. The fiscal quarters will be February-April (payment due May 25th), May-July (payment due August 25th), August-October (payment due November 23rd) and November-January (payment due February 25th).

- Failure by the Licensee to make timely payments of the Lead Fee, Marketing Fee or the additional marketing fee discussed here-in, or failure of the Licensee to remedy unacceptable selling practices, will enable Licensor to immediately re-direct firstSTREET Leads in the Licensee's Territory to another licensee without giving the Licensee notice or a 30 day period to cure the breach.

- Termination of the Dealership/License Agreement and this Addendum shall not affect obligations arising out of any Closed Sale, order or Lead that may have been taken or submitted prior to termination or that is the result of advertisements placed by firstSTREET prior to termination where the Lead is then sent to the Licensee after termination and any Closed Sale or Leads that result after termination will be paid according to the terms of this Addendum and the Dealership/License Agreement.

Licensee will maintain complete and accurate records during the term of the Agreement and for a period of twelve (12) months following the expiration of the Agreement, in a consistent form to substantiate the monetary payments to Licensor. Licensee will comply with the reporting requirements of the Agreement and use the reporting tools as determined by the Licensor which requires a $125 per month software fee if Licensee is not currently using LeadPerfection. Licensor may ask the Licensee to submit a copy of each customer contract that results in a Closed Sale. Failure by Licensee to meet these reporting requirements and/or maintain consistently accurate records, will constitute default of this Agreement and will allow Licensor to immediately re-direct firstSTREET Leads in the Licensee's Territory to another licensee without notice. Licensor may, upon ten (10) days advance written notice to Licensee, conduct, during Licensee's regular business hours, and in accordance with applicable law and reasonable security requirements, an audit of those records relating to this Addendum.

Fees described in Section A of this Agreement are subject to change based upon changes in market conditions. Should a change in fee be necessary, Licensee may reject the change in fee and terminate participation in the Agreement. However, Licensor shall then have the right to re-direct firstSTREET Leads in the Licensee's Territory to another licensee.

Licensee will use the firstSTREET trademark "DESIGNED FOR SENIORS SAFE STEP WALK IN TUBS" on Walk-In Bath Tub packaging and advertisements. For the term of the advertising campaigns run by firstSTREET, Licensee will not publish or run any advertisements for Walk-In Bath Tubs in print media or

3

## Addendum to Dealership/License Agreement

catalogs (excludes local newspapers and local non paid subscription publications). Additionally, Licensee will not engage in any internet pay per click or banner advertising for Walk-In Bath Tubs.

Licensee agrees that while its Dealership/License Agreement is in effect and for a period of two years after the termination of that Dealership/License Agreement, it will not hire or employ any of firstSTREET's employees to work as an employee in the United States. This applies to current firstSTREET employees as of the date of termination of the Dealership/License Agreement or former employees that worked for firstSTREET for the year immediately prior to termination of the Dealership/License Agreement.

Licensee agrees that while the Dealership/License Agreement is in effect and for a period of two years after the termination of that Dealership/License Agreement, it will not hire, solicit or enter into any agreement, venture, affiliation, or relationship with any contractor, supplier or vendor that supplied product or performed services for firstSTREET which were then provided to Licensor or Licensee by or through firstSTREET. This section does not apply to print publications.

Failure by the Licensee to sign this Addendum or to agree to any future modifications or changes to this Addendum shall permit the Licensor and its other Licensees to make sales within the Licensee's territory, and shall permit the Licensor to send Leads within the Licensee's Territory to other licensees, thus ending the EXCLUSIVITY provisions of the Dealership/License Agreement between Licensor and Licensee.

These modifications are mutually agreed to by the Licensor and the Licensee, and are supported by legal consideration. The remaining terms of the Dealership/License Agreement are unchanged.

Safe Step Walk in Tub Co., as Licensor

Signed: _____    Date: _Y-6-11_____

, as Licensee

Signed: _____    Date: _3|31|11_____

4